IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WAYNE ARTHUR JORDAN,     *

     Plaintiff,     *

v.     *     Civil Action No. GLR-21-2934

WARDEN BIVENS, et al.,     *

     Defendants.     *

          ***

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Defendants Corizon Health, Inc., and Dr. Maksed Choudry's Motion to Dismiss, or in the Alternative for Summary Judgment (ECF No. 49), Defendants Warden Bivens and Warden Weber's Motion to Dismiss, or in the Alternative Motion for Summary Judgment (ECF No. 53), and Defendant Dr. Sharon Baucom's Motion to Dismiss, or in the Alternative Motion for Summary Judgment (ECF No. 68). The Motions are ripe for disposition and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2023). For the reasons outlined below, the Court will grant Defendants' Motions, construed as ones for summary judgment.[1]

---

[1] The matter has been stayed as to Defendant Corizon Health, Inc., (ECF No. 50) and as such the dispositive motion filed on their behalf will not be considered at this time.

# I.    BACKGROUND

## A.    Jordan's Allegations

### 1.    Claims arising at RCI

Wayne Arthur Jordan is a state prison inmate presently housed at Roxbury Correctional Institution ("RCI") in Hagerstown, Maryland. (2d Am. Compl. at 2, ECF No. 26). Jordan alleges that he was transferred to RCI on July 9, 2021. (Id. at 3.) On July 12, 2021, he submitted a sick call slip requesting an emergency examination for assignment to a bottom bunk due to herniated disks in his neck and lower back. (Id.).

On August 9, 2021, he saw Dr. Choudry in the chronic care clinic and discussed his concerns. (Id. at 3). While Dr. Choudry assigned him to a bottom bunk, he refused to renew Jordan's prescription for Lyrica, advising that RCI did not prescribe those types of medications. (Id.).

After Jordan filed an administrative remedy grievance ("ARP") regarding the denial of medication, Dr. Choudry, on September 13, 2021, renewed Jordan's Lyrica prescription for three weeks, to and including October 7, 2021. (Id. at 4). Jordan did not receive Lyrica after October 7, 2021. (Id.).

On October 12, 2021, Physician's Assistant Crystal advised Jordan that she would schedule him for an appointment with Dr. Choudry for examination and renewal of his Lyrica prescription. (Id.). Crystal provided Jordan with exercises for his neck. (Id.). She failed, however, to schedule the appointment with Dr. Choudry. (Id.).

On October 18, 2021, Jordan believes, Nurse Christina cancelled his appointment with pain management and later tried to convince him that he had seen Dr. Jahed for pain

management. (Id.). That same day, Dr. Jahed and Nurse Christina "colluded to document that [Jordan] had a pain management clinic with Dr. Jahed." (Id.).

On November 1, 2021, in response to Jordan's request for offsite treatment, Warden Bivens directed Jordan address his concerns at his next chronic care clinic. (Id. at 4–5). In Jordan's view this "perpetuat[ed the] cycle of denial of the constitutional care requested . . . ." (Id.).

On November 2, 2021, Crystal advised Jordan that she would provide medication to treat his neuropathic pain but refused to provide him a cortisone injection, advising Jordan that the physician had to prescribe the shot. (Id. at 4). Crystal failed to schedule an appointment with the physician. (Id.). She advised Jordan that he was scheduled for the pain management clinic and should have been seen before his prescription for Lyrica expired on October 7, 2021. (Id.).

### 2. Claims arising at Western Correctional Institution ("WCI")

On December 25, 2020, while housed at WCI, Jordan submitted a sick call advising medical that his prescription for Cymbalta was no longer helping his neuropathic pain and he was having difficulty sleeping. (Id. at 6).

On December 27, 2020, Jordan spoke to Nurse Brittney about his pain while she passed out medication on his tier. (Id.). He told her that he was suffering from extreme pain in his neck, shoulder, and arm with burning from herniated discs. (Id.). She said she would have Nurse Felters call him to the dispensary, but he was not called. (Id.). The following day, Officer Frazier spoke with Nurses Amy and Peggy and requested that Jordan be seen on an emergency basis because he had submitted sick calls for extreme neuropathic pain

due to his herniated disks. (<u>Id.</u> at 5). Nurse Amy told Frazier "Tell him that he is not the only prisoner in the institution, we will get to him when his sick call slip comes up." (<u>Id.</u> at 5–6).

On January 1, 2021, Officer Raines called the dispensary to request Jordan receive emergency treatment for extreme chronic pain (<u>Id.</u> at 6). Nurse Amy again responded that Jordan should be told that "he is not the only person in prison, we will get to him when we can, sick-call is backed up." (<u>Id.</u>).

On January 5, 2021, Nurse Stella saw Jordan for sick call and advised that his prescription for Cymbalta would be adjusted and he would be seen by a provider. (<u>Id.</u> at 6). Jordan was seen again by nursing staff on January 9, 2021. (<u>Id.</u> at 6–7). At that time, the nurse advised him that she neglected to prepare a report of the January 5 encounter and again advised he would be scheduled to see a provider. (<u>Id.</u>).

Dr. Mohammed saw Jordan on January 26, 2021. (<u>Id.</u> at 7). He recommended Jordan take Elavil and Nortriptyline to help with sleep; no mention was made of providing anything for pain relief. (<u>Id.</u>) Jordan explained to Mohammed that he had previously been prescribed steroid tablets, Elavil, and Nortriptyline for his condition and encouraged the doctor to review his chart from 2015 at Maryland Correctional Training Center ("MCTC"). (<u>Id.</u>). Jordan declined to take the medications offered because they did not relieve the pain. (<u>Id.</u>).

On February 4, 2021, Dr. Mohammed refused to prescribe Jordan medication to treat his neuropathic pain after he was told that Jordan's prescription for Cymbalta was no longer effective. (<u>Id.</u> at 5). Mohammed instead recommended Elavil and Nortriptyline

which Jordan rejected because, in his view, they are for sleep disorders and psychiatric medications. (Id.).

On March 26, 2021, Commissioner Harvey responded to an ARP filed by Jordan (ARP WCI-2430-20), advising that "Neurontin is not FDA approved for neuropathic pain" which in Jordan's view, "condon[ed] Corizon's wrongful deliberate indifferent denial of meds & treatment." (Id. at 7).

On March 30, 2021, Dr. Mohammed prescribed Lyrica for four months. (Id. at 5). That same day Jordan learned that Lyrica had been prescribed for him when the nurse came around for medication distribution. (Id. at 7).

Jordan explains that from 2005 to 2018, he was prescribed Neurontin/Gabapentin for neuropathic pain which resolved his pain until it was replaced by Dr. Mohammed via telemedicine in 2018 with Cymbalta. (Id.).

### 3. Overall Complaints About Medical Care

In his view, Jordan's allegations "show the nexus between Corizon & DPSCS-Dr. Sharon Baucom, MD, Medical Admin, collusion to deny Plaintiff relief and treatment against extreme pain & suffering or adequate nerve pain meds other than Neurontin or Lyrica." (Id. at 8).

Jordan contends that the foregoing conduct violated his rights under the Eighth Amendment. (Id.). He also claims the actions and inactions of Nurse Amy, Wardens Weber and Bivens, and Drs. Mohammed, Choudry, and Baucom violated his rights under the First and Eighth Amendments and the Maryland Declaration of Rights, were retaliatory, and caused unnecessary pain and suffering. (Id.). He also alleges that Corizon and Dr. Baucom

failed to properly train and correct the actions/inactions of all Defendants causing him unnecessary pain and suffering. (Id.).

Jordan alleges that DPSCS and Corizon have a custom, practice, and policy which subjects prisoners to unnecessary pain and suffering and denial of treatment of serious medical needs in order to cut costs. (Id. at 9). Jordan states that "these customs, practices and policies are evidenced by members of the Pain Committee who denied him Neurontin and Lyrica prescriptions without examination, interview, or telemedicine conference." (Id.). Jordan claims that Corizon was aware that WCI personnel refused to treat his herniated disc but "turn[ed] a blind eye and used possible drug use by other prisoners as [a] basis & rationale to deny adequate treatment. . . ." (Id.).

Jordan alleges that Corizon was aware of the issues concerning his treatment based on his filing ARPs, letters, and inmate requests. (Id.). He contends that Wardens Bivens and Weber were aware of Dr. Choudry's refusal to adequately treat his serious medical need by his filing ARPs regarding his medical care. (Id. at 10–11).

As relief, Jordan seeks an injunction that Defendants provide neuropathic pain medication. (Id. at 14). He seeks declaratory relief as well as compensatory and punitive damages. (Id.).

**B.      Defendants' Response**

Dr. Choudry, a licensed medical doctor, explains that Lyrica is a brand name for pregabalin, an anticonvulsant medication which is used to treat nerve and muscle pains, herpes zoster, and fibromyalgia. (Choudry Decl. ¶¶ 2, 5, ECF No. 14-3). Lyrica may also be used with other medications to treat certain seizures. (Id. ¶ 5). It is not intended for long

term use to treat chronic pain. (Id.). Lyrica is a non-formulary medication, which requires it be approved before ordered. (Id.).

Medications such as Lyrica, Gabapentin, and Tramadol carry a risk of abuse. (Id. ¶¶ 5, 6). When Lyrica is abused it produces feelings of euphoria, relaxation, and calmness. (Id. ¶ 5). Medications which have the potential for abuse create additional security risks within correctional settings. (Id. ¶¶ 5, 6). These medications create a risk of abuse including diversion, selling for profits, overdoses, recreational use, and suicide attempts. (Id. ¶ 6). Because of their ability for misuse, these medications also increase the risk of altercations between inmates. (Id. ¶¶ 5, 6). The Department of Corrections has mandated that these medications not be prescribed unless there is a clear Federal Drug Administration recommendation. (Id. ¶ 6). Due to the security risks associated with the use of Lyrica, prisons prefer to prescribe other medications to treat nerve pain: medications which do not carry as great a risk for abuse. (Id. ¶ 5).

The Pain Committee was established to manage the use of medications which create an increased security risk. (Id. ¶ 6). The Committee is comprised of the Regional Medical Directors, a Doctor of Pharmacy, and Quality and Utilization Management. (Id. ¶ 7). All prescriptions for Gabapentin, Lyrica, and Tramadol must be authorized by the Pain Committee: no provider may self-authorize any of these medications (Id.).

Dr. Choudry explains that Gabapentin and Lyrica are occasionally prescribed for advanced diabetic polyneuropathy or "polyneuropathy of other etiology when there is a clear FDA recommendation." (Id. ¶ 8). Neither Gabapentin nor Lyrica are recommended for chronic, nonspecific pain such as described by Jordan. (Id.).

Medical providers prescribe other medications which have less risk for diversion by inmates to those inmates, such as Jordan, who suffer from chronic pain. (Id.). Such prescriptions include acetaminophen, nonsteroidal anti-inflammatories, topical agents, and physical therapy. (Id.). To alleviate neuropathic pain providers also use Carbamazepine, Depakote, Amitriptyline, and Nortriptyline. (Id.). If none of those medications provide relief, a provider may prescribe "Cymbalta which has a higher safety profile in a correctional facility." (Id.). If none of these medications provide relief and there is a "clear specific indication," or if an inmate requests, the matter is referred to the Pain Committee for review. (Id.).

Jordan's medical records demonstrate that on August 24, 2020, he had x-rays of his lumbar spine taken. (Medical Records at 2, ECF No. 14-4). The vertebral body heights and disc spaces were preserved: overall no acute osseous abnormalities were noted. (Id.).

On March 30, 2021, Dr. Mohammed saw Jordan in chronic care at WCI for treatment of hypertension, hyperlipidemia, and chronic neck pain. (Id. at 3). Jordan reported suffering aching and tingling pain that was relieved with Neurontin. (Id.). On examination, no sensory loss or weakness was seen. (Id. at 4). Based on Jordan's subjective reports, Dr. Mohammed noted that he would add Lyrica. (Id.). Dr. Mohammed did not receive pre-authorization from the Pain Committee. (Id.). He ordered Lyrica for 90 days. (Id.). Dr. Choudry opines that the 90-day prescription indicates it was for short term use because medications that are approved by the Pain Committee are ordered and renewed for 120 days. (Choudry Decl. ¶ 11).

Jordan transferred to RCI on July 8, 2021. (Id. ¶ 12). Dr. Choudry explains that when an inmate is transferred between facilities the "medication drops off and needs to be reordered." (Id.). Controlled substances such as Lyrica, Gabapentin, and Tramadol are renewed for 30-60 days to allow for providers to review the inmate's chart and get approval from the Pain Committee to continue the medication. (Id.). This was done in Jordan's case. (Medical Records at 6). Providers are typically notified by the pharmacy when a controlled medication needs to be renewed, however no notification was received in Jordan's case. (Choudry Decl. ¶ 12).

Dr. Choudry first saw Jordan on August 9, 2021 for chronic care. (Medical Records at 7). Dr. Choudry reports that Jordan's "subjective complaints were disproportionate to his objective presentation." (Choudry Decl. ¶ 13). Jordan did not report any bladder or bowel habit changes, impairment of mobility or in his activities of daily living. (Medical Records at 7–9). He reported chronic neck and lower back pain that radiated down the left arm. (Id.). He had active prescriptions for Tylenol, Naproxen, and Lyrica. (Id.). Dr. Choudry renewed his medications, including Lyrica for 60 days—until October 9, 2021. (Id. at 9). The renewal was limited until the request for Lyrica could be reviewed by the Pain Committee. (Chaudry Decl. ¶ 13; Medical Records at 11).

Dr. Choudry completed a Non-Formulary Drug Request for Lyrica on August 16, 2021. (Medical Records at 10). The request was approved, and Jordan received Lyrica on several dates throughout August, beginning August 10, 2021. (Id. at 10–12).

On September 13, 2021, Jordan saw PA Crystal Jamison due to his needing eye drops refilled and because he had not received his glasses. (Id. at 13). The report from that

encounter shows that Jordan had an active prescription for Lyrica from August 9 until October 9, 2021. (Id.).

Jordan had cervical spine x-rays on September 22, 2021. (Medical Records at 15). No fracture, dislocation, or subluxation was observed. (Id.). Vertebral body heights and disc spaces were intact with minimal spondylosis. (Id.). The radiologist found no osseous abnormality. (Id.). Jordan also had a left shoulder x-ray that day. (Id. at 16). The x-rays were normal and provided no objective evidence that Lyrica was medically necessary. (Chaudry Decl. ¶ 16). Jordan was provided Lyrica throughout September of 2021. (Medical Records at 17–18).

Dr. Choudry updated Jordan's chart on October 18, 2021, noting that Jordan was a recent transfer to RCI, 57 years old, with chronic neck pain but no bladder or bowel dysfunction or impairment of mobilities. (Id. at 19–21). He noted that Jordan started on Lyrica for neck pain prior to his transfer to RCI and requested review by the Pain Committee for continuation of Lyrica as it had recently expired. (Id.) Jordan continued to receive Lyrica in October until the prescription expired around October 12. (Id. at 23).

Dr. Choudry next saw Jordan on December 7, 2021. (Id. at 24). Jordan complained of chronic neck pain, lower back pain, and bilateral knee pain with radiation of pain down his left arm. (Id.). He was taking Naproxen as needed, and Dr. Choudry added Glucosamine. (Id.). Jordan reported he had not been on Lyrica since August, but the medicine distribution showed he receive Lyrica regularly until the prescription expired in October. (Chaudry Decl. ¶ 19). Dr. Choudry noted that he was awaiting approval by the Pain Committee to restart Lyrica. (Medical Records at 24). Jordan was willing to try

Tegretol for his radiating pain. (Id.). Dr. Choudry observes that Jordan's recent x-rays did not show any bony changes and there was no objective reason for Jordan to require a medication such as Lyrica. (Chaudry Decl. ¶ 20).

Dr. Choudry updated Jordan's chart on December 20, 2021. (Medical Records at 26). He noted that Jordan's case had been reviewed by the Pain Committee on December 14, 2021, with the Pain Committee recommending continuation and optimization of the use of Tegretol and if that therapy failed then the Pain Committee was to be consulted. (Id.).

Dr. Choudry denies disregarding or ignoring Jordan's medical needs. (Chaudry Decl. ¶ 22). He renewed Jordan's Lyrica prescription for sixty days after he was transferred to RCI. (Id.). The final decision whether Lyrica was medically indicated was made by the Pain Committee, which denied Lyrica. (Id.). Further, Dr. Choudry states that he never observed any objective evidence in his examination of Jordan, review of his medical records, including x-rays, that showed he needed Lyrica. (Id.). Dr. Choudry provided alternative pain medication and followed the rules and polices for requesting Lyrica for Jordan. (Id.).

Dr. Baucom, who was employed by DPSCS as Executive Director of Clinical Services from June 2001 to June 2022, avers that she did not have supervisory authority over the private medical contractor's staff. (Baucom Decl. ¶¶ 1, 4, ECF No. 68-3). As Director of Clinical Services Dr. Baucom was an administrator who did not practice medicine or provide medical care, including prescribing medications or recommending any specific medical care for any inmate. (Id. ¶ 2). She did not oversee medical personnel at

any correctional facility. (Id. ¶ 4). Any complaints by inmates regarding their medical care are reviewed by DPSCS Agency Contract Operations Manager or the nurse consultant assigned to that region. (Id. ¶ 8). Dr. Baucom never received or responded to any communication regarding Jordan's medical care. (Id.). She also denied ever interfering with, hindering, or delaying Jordan's care. (Id. ¶ 9).

**C.**    **Procedural History**

Self-represented Plaintiff Wayne Jordan filed this case on November 15, 2021, pursuant to 42 U.S.C. § 1983. (ECF No. 1). On March 14, 2022, Corizon Health, Inc., and Dr. Maksed Choudry ("Medical Defendants") filed a Motion to Dismiss, or in the Alternative Motion for Summary Judgment (ECF No. 14). On May 13, 2022, Defendants Biven and Weber filed a Motion to Dismiss, or in the Alternative Motion for Summary Judgment. (ECF No. 23). Jordan filed a Motion to Amend, an Amended Complaint, a Second Amended Complaint, a Second Motion for Leave to Amend, and a Motion to Correct the Record. (ECF Nos. 17, 18, 26, 30, 40). On January 23, 2023, the Court denied Medical Defendants and Wardens Bivens and Weber's dispositive motions without prejudice and granted Jordan's requests to amend the complaint. (Jan 23, 2023 Order at 2, ECF No. 47). The Court directed that Jordan's Second Amended Complaint filed on June 6, 2022 serve as the operative Complaint. (Id.).

The Second Amended Complaint added as Defendants Drs. Mohammed, O'Neil and Baucom, as well as Nurse Amy and John Doe Defendants. (ECF No. 26). Efforts were undertaken to serve the additionally named Defendants. Dr. Baucom was served on November 20, 2023, (ECF No. 61), and on February 8, 2024 she filed a Motion to Dismiss

or in the alternative for Summary Judgment, (ECF No. 68). Defendants Drs. O'Neil, Mohammed, and Nurse Amy have not been served with the Second Amended Complaint. (ECF Nos. 60, 65). As such, the Complaint is dismissed without prejudice as to Defendants Drs. O'Neil and Mohammed and Nurse Amy.

Defendants Corizon Health, Inc., and Dr. Maksed Choudry renewed their dispositive motion on March 6, 2023. (ECF No. 49). Wardens Bivens and Weber renewed their dispositive motion on May 3, 2023, (ECF No. 53), and filed a Motion to Seal Jordan's medical records, (ECF No. 55). Dr. Baucom filed a dispositive motion on February 9, 2024 and a Motion to Seal Jordan's medical records. (ECF Nos. 68, 70). Jordan was notified of his right to oppose the motions. (ECF Nos. 56, 66, 71). He filed an opposition response to the dispositive motions but does not oppose the motion to seal. (See Opp'n Bivens and Weber Mot. Dismiss ["Opp'n"], ECF No. 57, incorporating previously filed opposition responses ECF Nos. 23 and 42; Opp'n Baucom Mot. Summ. J., ECF No. 72). He also filed more fulsome oppositions to Corizon's and Baucom's dispositive Motions on March 18, 2024. (ECF Nos. 76, 77). Defendants did not file a reply.

## II.    DISCUSSION

### A.    Standards of Review

#### 1.    Conversion

Defendants' Motion are styled as Motions to Dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for Summary Judgment under Federal Rule of Civil Procedure 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. See Kensington Volunteer Fire Dep't,

Inc. v. Montgomery Cnty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P.1 2(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005) (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998)).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party

had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement." Nautilus Ins. Co. v. REMAC Am., Inc., 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting Evans, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is pre-mature and that more discovery is necessary." Harrods, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party," such as "complex factual questions about intent and motive." Id. (quoting 10B Wright, Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

Nonetheless, a Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v.

Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs, 55 F.3d 943, 954 (4th Cir. 1995)).

Here, the Court concludes that both requirements for conversion are satisfied. Jordan was on notice that the Court might resolve Defendants' Motions under Rule 56 because Defendants styled their Motion as a motion in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. In addition, the Clerk informed Jordan about the Motions and need to file an opposition. Jordan filed Oppositions, as well as a declaration in support of his claims. (See generally[2] Opp'n; ECF Nos. 76, 77). He generally alleges that summary judgment should not be granted before discovery is completed, but he does not identify what discovery he seeks or why he is unable to oppose the dispositive motion. (Opp'n at 3–4). Subsequently, Jordan filed a request for discovery, (ECF Nos. 72, 73), which was denied because he again failed to specify what discovery was needed to craft an opposition response or explain why the materials he had access to were insufficient to oppose the motions. (See February 13, 2023 Order at 5, ECF No. 75 (denying Jordan's request for discovery and granting him additional time to respond to the dispositive motions)).

Because the Court will consider documents outside of Jordan's Complaint in resolving Medical Defendants' Motion, the Court will treat the Medical Defendants'

---

[2] Jordan alleges for the first time in his opposition response that race dictates who receives certain medication such as Lyrica, Tramadol, and Gabapentin, (Opp'n at 4), and that the Pain Committee refused to refer to him an outside specialist, (Id. at 2). Those claims may not be raised for the first time in an opposition response and will not be considered.

Motion as one for summary judgment. Warden Bivens and Weber and Dr. Baucom's Motions are construed as Motions to Dismiss.

### 2. Summary Judgment

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing that there is a genuine dispute of material fact. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan,

526 F.3d 135, 140 (4th Cir. 2008) (quoting <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>JKC Holding Co., LLC v. Wash. Sports Ventures, Inc.</u>, 264 F.3d 459, 465 (4th Cir. 2001) (citations omitted). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986).

### 3.    Motion to Dismiss

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." <u>King v. Rubenstein</u>, 825 F.3d 206, 214 (4th Cir. 2016) (quoting <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible

on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). Complaints drafted by self-represented plaintiffs are held to a less stringent standard than those drafted by attorneys, and courts must liberally construe these complaints. See Johnson v. Silver, 742 F.2d 823, 825 (4th Cir. 1984). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

**B.**    <u>**Analysis**</u>

**1.    Motions to Seal**

Local Rule 105.11 governs the sealing of all documents filed in the record and states in relevant part that: "[a]ny motion seeking the sealing of pleadings, motions, exhibits or other documents to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection." Local Rule 105.11 (D.Md. 2023). The rule balances the public's general right to inspect and copy judicial records and documents, <u>see</u> <u>Nixon v. Warner Commc'ns, Inc</u>., 435 U.S. 589, 597 (1978), with competing interests that sometimes outweigh the public's right, <u>see</u> <u>In re Knight Publ'g Co</u>., 743 F.2d 231, 235 (4th Cir. 1984). The common-law presumptive right of access can only be rebutted by showing that "countervailing interests heavily outweigh the public interest in access." <u>Doe v. Pub. Citizen</u>, 749 F.3d 246, 265–66 (4th Cir. 2014) (quoting <u>Rushford v. New Yorker Magazine, Inc.</u>, 846 F.2d 249, 253 (4th Cir. 1988)). The right of access "may be restricted only if closure is 'necessitated by a compelling government interest' and the denial of access is 'narrowly tailored to serve that interest.'" <u>Id.</u> at 266 (quoting <u>In re Wash. Post Co.</u>, 807 F.2d 383, 390 (4th Cir. 1986)). "[S]ensitive medical or personal identification information may be sealed," although not where "the scope of [the] request is too broad." <u>Rock v. McHugh</u>, 819 F.Supp.2d 456, 475 (D.Md. 2011).

Defendants have not provided a sufficiently compelling reason to seal Jordan's medical records that were previously filed by Medical Defendants and have remained unsealed on the docket. (<u>See</u> <u>e.g</u>. Choudry Decl., ECF No. 14-3; Certificate of Records,

ECF No. 14-4). While the exhibit contains Jordan's medical information, that medical information was also presented by Jordan in his original and amended complaints. Defendants have offered no explanation why other alternatives to sealing would not be effective. As such, the Motions to Seal (ECF Nos. 55, 70) are denied.

## 2. Eighth Amendment

Jordan alleges that Defendants failed to provide him adequate medical care. The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. U.S. Const. amend. VIII; Gregg v. Georgia, 428 U.S. 153, 173 (1976). To sustain a claim for denial of medical care under the Eighth Amendment, a plaintiff must show that the defendant's acts or omissions were done with deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); accord Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Heyer, 849 F.3d at 210 (quoting Iko, 535 F.3d at 241); see also Scinto v. Stansberry, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendant was subjectively reckless in treating or failing to treat the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). Indeed, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment." Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (citation omitted). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendant knew about the problem. Scinto, 841 F.3d at 226. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. (quoting Farmer, 511 U.S. at 842).

Mere negligence or malpractice does not rise to a constitutional level. Donlan v. Smith, 662 F.Supp. 352, 361 (D.Md. 1986). "Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm

or with knowledge that harm will result.'" <u>Scinto</u>, 841 F.3d at 225 (quoting <u>Farmer</u>, 511 U.S. at 835) (alteration in original); <u>Russell v. Sheffer</u>, 528 F.2d 318, 318–19 (4th Cir. 1975) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim").

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew of at the time. <u>See</u> <u>Lightsey</u>, 775 F.3d at 179 (physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." <u>United States v. Clawson</u>, 650 F.3d 530, 538 (4th Cir. 2011) (quoting <u>Bowring v. Godwin</u>, 551 F.2d 44, 47–48 (4th Cir. 1977)).

The record before the Court demonstrates that Dr. Choudry was not deliberately indifferent to Jordan's medical needs. The evidence shows that upon Jordan's transfer to RCI, Dr. Choudry evaluated him and renewed his prescriptions, including his prescription for Lyrica. (Medical Records at 3–4, 6, 9). Contrary to Jordan's assertions, he continued to receive Lyrica until the prescription issued by Dr. Choudry expired in October of 2021. (<u>Id.</u> at 9–12). Dr. Choudry renewed the prescription issued by Dr. Mohammed and requested the prescription be provided by submitting a non-formulary drug request. (<u>Id.</u> at

9–12, 19–21). He also requested that the Pain Committee evaluate Jordan's need for that medication. (Id.). When the prescription expired without the Pain Committee having considered Jordan's need, Dr. Choudry offered alternative analgesic medication which Jordan accepted. (Id. at 24, 26). Thereafter, the Pain Committee declined to continue Jordan's prescription for Lyrica. (Id.). Dr. Choudry avers that Jordan did not have any objective indicia for the need for Lyrica but nevertheless he renewed the prescription to allow the Pain Committee to review Jordan's need. (Chaudry Decl. ¶ 22). Thereafter Dr. Choudry provided alternative analgesic medication for Jordan. (Medical Records at 24, 26). Under these circumstances, the Court cannot find that Dr. Choudry was deliberately indifferent to Jordan's serious medical needs.

Had Nurse Amy, Dr. Mohammed and Dr. O'Neil been properly served with the Complaint, or a member of the Pain Committee had been properly identified and served with the Complaint, they too would be entitled to summary judgment. First, Jordan's only allegation as to Nurse Amy is that on two occasions a tier officer called the medical unit to secure an evaluation of Jordan and Nurse Amy responded that he would need to wait his turn because "sick-call" was backed up. (2d. Am. Compl. at 5–6). This allegation is insufficient to state a claim against Nurse Amy as there is simply no allegation that Nurse Amy was aware of Jordan's serious medical need and that she disregarded it. Jordan had submitted a sick call slip on Christmas Day and was waiting to be seen. (Id.). While the Court does not doubt his reports of significant pain, there is no indication in the record that Nurse Amy was aware of that pain, based on the Officer's reports, or that she was in a position to see Jordan for a non-emergency visit any sooner than occurred. (See id.).

As to Dr. O'Neil, there are no allegations in the Complaint that Dr. O'Neil personally participated in any of the conduct alleged. (See generally 2d Am. Compl.). As such, he too is entitled to dismissal.

Lastly, as to unidentified member of the Pain Committee and Dr. Mohammed, the record evidence demonstrates that Dr. Mohammed did prescribe Jordan Lyrica while he was housed at WCI. (Medical Records at 4). To the extent Jordan complains of the delay in being provided that prescription, his complaint is simply one of a disagreement with his medical provider as to the proper course of treatment.

Similarly, Jordan's allegations regarding the Pain Committee fair no better. The Pain Committee reviewed Jordan's medical history, records, subjective complaints, and objective diagnostic testing and determined that a trial of Tegretol should be pursued to its full efficacy before Lyrica was reconsidered. (Id. at 26). As noted, providing Lyrica in a prison setting creates additional security risks and as such it is reasonable to reserve its use for those patients whose medical providers all agree that the medication's need outweighs its risks. (Choudry Decl. ¶¶ 5, 6). That Dr. Mohammed prescribed Jordan Lyrica and Dr. Choudry and the Pain Committee disagreed with that prescription is of no moment as disagreements between medical providers as to the proper course of treatment does not alone evidence deliberate indifference to a serious medical need.

Lastly, while Jordan's prescription for Lyrica was discontinued, he still received other analgesic medication. (Medical Records at 24, 26). While the Court is sympathetic to Jordan's complaints of increased pain after the discontinuation of Lyrica, Dr. Choudry has presented evidence that the decision not to renew the medication was based on his

professional belief regarding Jordan's medical needs as well as his actions being in compliance with policy regarding the prescription of certain highly abused medications. (Id.). On this record, the Court cannot say that any of the named Defendants were deliberately indifferent to Jordan's serious medical needs.

### 3. First Amendment

Jordan's retaliation claim is most fairly construed as a claim that he suffered retaliation for exercising his First Amendment right to petition for the redress of grievances. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). In order to set forth a colorable First Amendment retaliation claim under § 1983, a plaintiff must allege that: (1) the plaintiff "engaged in protected First Amendment activity; (2) the defendant[ ] took some action that adversely affected [plaintiff's] First Amendment rights; and (3) there was a causal relationship between [plaintiff's] protected activity and the defendant['s] conduct." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." Shaw v. Murphy, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with [the] status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Specifically, the Fourth

Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. Booker v. S.C. Dep't of Corr., 855 F.3d 533, 545 (4th Cir. 2017).

A plaintiff could establish retaliatory conduct if the defendant took an action that "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) (internal quotation marks and citations omitted). A plaintiff must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. See Constantine, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliatory act was temporally proximate to that activity. Id.

Jordan baldly states that he was retaliated against by Defendants. (See 2d Am. Compl. at 8). He does not specify what First Amendment activity he engaged in. (See id.). To the extent he believes he was retaliated against because he filed grievances regarding his medical care, his claim fails. Jordan has failed to allege action by any of the named Defendants that adversely affected his First Amendment rights. Further, he has failed to allege, much less demonstrate, a causal connection between his First Amendment activity and the alleged retaliatory conduct. Without an allegation that the individual responsible for the allegedly adverse action knew of Jordan's prior grievances the Court cannot

conclude that Jordan has stated a claim for retaliation. Thus, Jordan did not allege essential elements of his claim, and the retaliation claim must be dismissed.[3]

### 4. Personal Participation

Jordan has failed to state a claim against Wardens Bivens and Weber and Dr. Baucom. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. See Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (explaining that there is no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the

---

[3] In his Opposition, Jordan points to Wardens Bivens and Weber's resolution of his grievances as evidence of retaliation; e.g. that despite finding his complaints meritorious in part, they did not provide a resolution of his claim. (Opp'n at 10–11). This allegation also fails to state a claim because again it does not allege how his First Amendment rights were adversely affected by the resolution of his grievances. Nor has he alleged or demonstrated a causal connection between his First Amendment activity and the alleged retaliatory conduct. Instead, this allegation is merely a disagreement with how each Warden responded to his grievance. Jordan contends that the responses to his grievance violated the Maryland Code of Regulations, but even if that is true, violation of state policy does not rise to a constitutional claim.

knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).

Such evidence is lacking in this case. Jordan contends that the Wardens were aware that the medical providers refused to provide him the medication he requested and complains that they deferred to the medical providers rather than directing his medical treatment or directing he be transferred to an outside medical facility. (See e.g. 2d Am. Compl. at 4–5, 10–11, 13; Opp'n at 7–8). He alleges that they were aware of his treatment based on the ARPs he filed. (Id.). As to Dr. Baucom, he alleges that she was responsible for overseeing medical personnel at correctional facilities and determine the duration of time that the contractors remained working at the facility. (2d Am. Compl. at 3). He is mistaken as to Dr. Baucom's role. In any event, Jordan's conclusory claims of supervisory liability are unavailing, and the Complaint is dismissed as to Bivens, Weber and Baucom.

Lastly, to the extent Jordan relies on Wardens Bivens and Weber's review of his administrative remedies as evidence of their denial of his rights, this too is insufficient to state a claim against Bivens or Weber. Processing of Jordan's ARP requests and appeals does not alone impose liability. See Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009) (allegation that the wardens "rubber-stamped" grievances were not enough to establish personal participation); see also Larson v. Meek, 240 F.App'x 777, 780 (10th Cir. 2007). Thus, the Court dismisses Jordan's Complaint as to Weber and Bivens as there is

no evidence that these Defendants were aware of, authorized, or displayed indifference to the misconduct alleged in this case.

Jordan also alleges that there is "a custom, practice, and policy in DPSCS. . . of subjecting prisoners to unnecessary wanton pain & suffering, and denial of treatment of serious medical needs. . . ." (2d Am. Compl. at 8–9).

A claim for an alleged violation of constitutional rights may be premised on an allegation that a policy or practice has caused the injury alleged. See Monell v. Dep't of Social Servs. of City of New York, 436 U.S. 658, 691–92 (1978); see also Simons v. Montgomery Cnty. Police Officers, 762 F.2d 30, 33 (4th Cir. 1985). To sustain such a claim, however, a plaintiff must establish (1) the existence of a constitutional violation, see Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (holding that jury's finding that a police officer inflicted no constitutional injury on the plaintiff removed any basis for municipal liability against city and members of police commission), and (2) any constitutional violations were proximately caused by a policy, custom, or practice of the defendants, see Monell, 436 U.S. at 691.

Jordan voluntarily withdrew this claim in his Opposition. (See Opp'n at 8–9). Moreover, even had he not, his generalized assertions that there is a policy that results in inmates being denied medical care in order to save money is unavailing. He fails to explain the basis for this assertion and fails to identify the policy. In any event, the claim fails as discussed infra, as no constitutional violation has been established.

### 5.  Eleventh Amendment

As noted, Jordan asserts claims against state employees Defendants Weber, Bivens, and Baucom. Under the Eleventh Amendment of the United States Constitution, a state, its agencies, and its departments are immune from citizen suits in federal court absent state consent or Congressional action. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. See Brandon v. Holt, 469 U.S. 464, 471–72 (1985). The State of Maryland has not waived such immunity for claims of constitutional violation brought under § 1983. See Pevia v. Hogan, 443 F.Supp.3d 612, 632 (D.Md. 2020). Accordingly, Defendants Bivens, Weber and Baucom are immune from suit for actions taken in their official capacities, and the constitutional claims asserted against them in their official capacities are likewise dismissed. In contrast, the Eleventh Amendment does not bar Jordan's request for prospective injunctive relief.

### 6.  Injunctive Relief

Jordan seeks injunctive relief directing Defendants to provide him certain medical treatment. A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). Failure to establish one of these elements is fatal to the request for injunctive relief. For the reasons discussed above, Jordan

has failed to demonstrate the likelihood of success on the merits. Therefore, his request for injunctive relief must be denied.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Defendants Corizon Health, Inc., and Dr. Maksed Choudry's Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF No. 49), construed as a motion for summary judgment, and will grant Warden Bivens, Warden Weber, and Dr. Baucom's Motions to Dismiss, or in the Alternative, for Summary Judgment (ECF Nos. 53, 68), construed as motions to dismiss. The Complaint is dismissed as to Defendants O'Neil, Mohammed and Nurse Amy. Defendants' Motions to Seal (ECF Nos. 55, 70) are denied.

A separate Order follows.

Entered this 21st day of March, 2024.


_____/s/_____
George L. Russell, III
United States District Judge